# In the United States Court of Federal Claims

No. 10-141C
(Filed: March 31, 2015)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | |
| **JASMINE INTERNATIONAL TRADING & SERVICES, CO. W.L.L.,** | Contract Disputes Act, 41 U.S.C. § 601 et seq. ; Common-Law Fraud Counterclaim; Failure to State a Claim Upon Which Relief Can Be Granted, Rule 12(b)(6); Alleged Nexus Between Fraud and Contract Awards. |
| Plaintiff, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | |

Barry Wm. Levine, Dickstein Shapiro LLP, 1825 Eye Street, NW, Washington, D.C. 20006, for Plaintiff.

Stuart F. Delery, Jeanne E. Davidson, Deborah A. Bynum, and Russell J. Upton, United States Department of Justice, Civil Division, Post Office Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant. Captain Dana M. Collins, United States Army, Litigation Division, of Counsel.

___

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S AMENDED COUNTERCLAIM**

___

**WILLIAMS**, Judge.

This matter comes before the Court on Plaintiff's motion to dismiss Defendant's amended counterclaim for failure to state a claim upon which relief can be granted. Plaintiff Jasmine International Trading & Services, Company W.L.L. ("Jasmine") was the awardee of multiple contracts with the United States Army Contracting Command SWA-Kuwait ("the Army"). Defendant alleges that Plaintiff provided bribes and other things of value to an Army officer in Kuwait in exchange for the award of contracts, blanket purchase agreements ("BPAs"), and calls under those BPAs. Defendant asserts a common-law fraud counterclaim, seeking rescission of the contracts Plaintiff allegedly obtained through fraud and the disgorgement of

monies the United States paid Plaintiff under the contracts.[1]  Plaintiff contends that Defendant failed to allege that fraud was the cause of the awards.

This Court denies Plaintiff's motion to dismiss because Defendant sufficiently pled a direct causal nexus between the alleged fraudulent conduct and the awarded contracts.

## **Background**[2]

### **Jasmine and Major Cockerham**

Jasmine is a Kuwaiti company specializing in the sale of durable and nondurable goods. Diaa Salem was the chief executive officer of Jasmine.  Am. Answer to Pl.'s Fifth Am. Compl. and Countercls. ("Am. Answer") ¶ 101; Def.'s Mot. for Leave to File an Am. Answer to Pl.'s Fifth Am. Compl. ("Mot. for Leave"), App. 16.

Major John Cockerham was deployed to Camp Doha in Kuwait from November 2000 until January 2002, where he served as the Headquarters Company Commander, and again from April 2002 to February 2003, where he worked as a contracting specialist.  Am. Answer ¶ 98.  Major Cockerham was deployed to Camp Arifjan from approximately June 30, 2004 to late December 2005, as a contracting officer, where he was responsible for soliciting bids and awarding contracts in support of Army operations in southwest Asia.  Id. at ¶ 99.

During his deployment to Camp Doha from November 2000 to January 2002, Major Cockerham became acquainted with Mr. Salem and they remained in contact when Major Cockerham returned to the United States in February 2003.  Id. at ¶¶ 104-05.  In the spring of 2004, Mr. Salem traveled to San Antonio, Texas to visit Major Cockerham.  Id. at ¶ 106.  Defendant alleges that during this visit, Mr. Salem gave Major Cockerham $1,200 and requested his assistance in starting a corporation in the United States.  Id.  On or about April 16, 2004, Major Cockerham incorporated D & J Trading as a Texas corporation, with Major Cockerham owning 51% and Mr. Salem owning 49%.  Id. at ¶ 107; Mot. for Leave, App. 17.  In June 2004, when Major Cockerham was deployed as a contracting officer to Camp Arifjan, he remained in contact with Mr. Salem.  Am. Answer ¶ 108.

---

[1] Originally Defendant had asserted counterclaims under the Forfeiture of Fraudulent Claims Act ("FFCA"), 28 U.S.C. § 2514, also known as the Special Plea in Fraud Act, and the False Claims Act ("FCA"), 31 U.S.C. § 3729, but it withdrew these statutory counterclaims. Under Rule 41, Defendant's withdrawn counterclaims will be dismissed without prejudice.  Rule 41(a)(1)(A), in conjunction with Rule 41(c), permits a party to voluntarily dismiss any counterclaim without a court order by filing a notice of dismissal or a stipulation of dismissal. Pursuant to Rule 41(a)(1)(B), when a party voluntarily dismisses its claims without a court order, the dismissal is without prejudice unless the notice states otherwise.

[2] This background is derived from Plaintiff's fifth amended complaint, Defendant's amended answer to Plaintiff's fifth amended complaint, Plaintiff's supplemental reply brief in support of its motion to dismiss, the exhibits to Plaintiff's fourth amended complaint, and the appendices to the parties' motion papers, cited as "App."

Defendant alleges Mr. Salem agreed to give "things of value" to Major Cockerham, including providing money to Major Cockerham's sister, in exchange for the award of contracts, BPAs, and calls. Am. Answer ¶ 103; Mot. for Leave, App. 18. Specifically, Defendant contends Mr. Salem offered to pay Major Cockerham $1 million in or around August 2004, in exchange for the award of government contracts. Am. Answer ¶ 110. "A handwritten note found in Major Cockerham's residence states that he expected '1 million' from 'Jas.'" Id. Defendant alleges that Major Cockerham's sister, Carolyn Blake, traveled to Kuwait on August 27, 2004. Id. at ¶ 109. While there, Mr. Salem paid for her one-week stay at the Crowne Plaza Hotel in Kuwait and gave her several hundred dinars in spending money. Id. Defendant alleges that Ms. Blake occasionally collected bribes for her brother Major Cockerham and that Major Cockerham and Ms. Blake maintained a list of all the money Ms. Blake received from government contractors on Major Cockherham's behalf. This list indicated that Ms. Blake received $60,000 from Mr. Salem in July 2005. Id. at ¶¶ 111-13. In exchange for the bribes and other things of value provided by Mr. Salem, Major Cockerham allegedly assisted in awarding Contract No. W912D1-04-P-0931, Contract No. W912D1-06-C-0007, Contract No. W912D1-04-A-0050, and calls under Contract No. W912D1-04-A-0050 to Jasmine. Id. at ¶¶ 96, 116, 120, 130.

**Jasmine's Contracts to Provide and Service Latrines**

### The 0931 Contract

On September 28, 2004, the Army awarded Jasmine Contract No. W912D1-04-P-0931 ("0931 Contract") for the delivery of latrines. Fifth Am. Compl. ¶¶ 5, 7. Defendant alleges Major Cockerham assisted in awarding this contract to Jasmine by signing an award-recommendation memorandum on or around September 25, 2004. Am. Answer ¶¶ 119, 121. The September 25, 2004 memorandum identifies Major Cockerham as the "POC [point of contact]" for the 0931 Contract, and it includes his signature, the signatures of a three-member Review Board, and the signature of the Chief of the Army's Contract Branch. Pl.'s Suppl. Reply Br. in Support of Mot. to Dismiss, Ex. 2. The Review Board reviewed a folder on the 0931 Contract provided by Major Cockerham and subsequently recommended that Jasmine be awarded the contract. Id.

Jasmine was to deliver the latrines in six phases under Contract Line Item Numbers ("CLINs") 0001, 1001, 1002, 1003, 1004, and 1005, and the period of performance was to end on July 1, 2006. Fifth Am. Compl. ¶¶ 5, 7. Jasmine performed services pursuant to CLINs 0001, 1001, 1002, and 1003. Id. at ¶ 8. On or around July 14, 2005, Major Cockerham orally requested that Jasmine provide and service 21 latrines in addition to the latrines that Jasmine was already servicing under the 0931 Contract. Id. at ¶ 9. Jasmine provided and serviced the additional latrines and submitted invoices for these 21 additional latrines as well as the latrines subject to the 0931 Contract. Id. at ¶ 11. From 2004 to 2006, the Army paid Jasmine approximately $3,268,000 for services provided under the 0931 Contract. Am. Answer ¶ 123. This payment allegedly did not include the full amounts due for CLINs 1002 and 1003 or any payments for the 21 additional latrines. Fifth Am. Compl. ¶ 15.

On or around February 27, 2006, Jasmine received a letter ordering it to remove all latrines from Camp Arifjan immediately because the 0931 Contract had ended on September 30, 2005. Fifth Am. Compl. ¶ 13. Defendant paid Jasmine 44,400 Kuwaiti Dinars for services allegedly performed between October 1, 2005, and November 30, 2005, pursuant to the 0931 Contract. Am. Answer ¶ 82. Defendant asserts these payments were made in error because Jasmine did not have a contract to perform the services at the time and requests that any amount Jasmine recovers in this action be offset by 44,400 Kuwaiti Dinars. Id. at ¶¶ 83, 84. Jasmine viewed the order for removal of the latrines as a breach of the 0931 Contract because this order terminated the contract earlier than stipulated before all six phases had been completed. Fifth Am. Compl. ¶¶ 5, 13, 14. On November 13, 2006, Jasmine submitted a claim seeking 286,744.90 Kuwaiti Dinars. Id. at ¶ 20; Fourth Am. Compl., Ex. E. On June 1, 2010, Jasmine received the contracting officer's final decision ("COFD") denying the claim except for 91,041.576 Kuwaiti Dinars, which was payment for services Jasmine provided from October 1, 2005, to February 27, 2006. Fifth Am. Compl. ¶ 21; Fourth Am. Compl., Ex. F.

On or around October 23, 2005, the Army's Department of Logistics requested a quote from Jasmine to service 113 additional latrines at Camp Arifjan. Fifth Am. Compl. ¶ 48. Jasmine provided a quote on October 31, 2005, and Major Cockerham accepted Jasmine's quote via email that same day. Id. Jasmine requested documentation to reflect this acceptance, but the Army allegedly did not provide Jasmine with this documentation. Id. at ¶ 50.

**The 0007 Contract**

On or around November 1, 2005, Major Cockerham posted solicitation number W912D1-06-R-0011 for latrine services. Am. Answer ¶ 126. Jasmine submitted a proposal, and its quoted price was higher than at least three other contractors who submitted proposals. Id. at ¶ 127. Defendant alleges that Major Cockerham supervised the personnel conducting the technical evaluation of the bids and that he assigned ratings to the bids so Jasmine would receive the highest adjectival rating. Id. at ¶¶ 128, 129. On November 5, 2005, the Army awarded Jasmine Contract No. W912D1-06-C-0007 ("0007 Contract"), which required Jasmine to service and maintain 617 latrines at Camp Arifjan. Fifth Am. Compl. ¶¶ 46, 47.

Jasmine serviced 730 latrines at Camp Arifjan and submitted invoices for these services on February 6, 2006. Id. at ¶ 51. Jasmine also invoiced the Army for repairs that it made to government-owned latrines in December 2005, January 2006, and February 2006. Id. at ¶ 53. The Army allegedly did not pay Jasmine the full amounts due under the invoices, and Jasmine submitted a claim on November 13, 2006, seeking 15,526.89 Kuwaiti Dinars. Id. at ¶¶ 53, 55; Fourth Am. Compl., Ex. B.[3] On June 1, 2010, Jasmine received the COFD denying its claim in its entirety. Fifth Am. Compl. ¶ 56.

**Jasmine's Contract for Equipment and Supplies: The 1172 Contract**

---

[3] From November 2005 to February 2006, the Army paid Jasmine approximately $475,000 for services rendered under the 0007 Contract. Am. Answer ¶ 132.

4

On September 24, 2005, the Army awarded Jasmine Contract No. W912D1-05-P-1172 ("1172 Contract"). Fifth Am. Compl. ¶ 24. Under the 1172 Contract, Jasmine provided the Army Department of Logistics with equipment and supplies, including a 60-foot paint booth. Id. at ¶ 26. After the contract was approved, Jasmine realized that the vendor's quoted price was based on different product specifications, rendering the contract price too low. Id. at ¶ 28. Jasmine obtained three new price proposals, provided them to Captain James Tulloch, and offered to provide the paint booth at Jasmine's cost. Id. Captain Tulloch, with the approval of Major Cockerham, selected one of the new proposals, and the parties agreed to modify the order. Id. at ¶ 29. Jasmine then sent the Army a detailed written price quote with insurance, shipping, and miscellaneous charges amounting to $119,840. Id. Major Cockerham and Captain Tulloch verbally agreed to the revised terms, and Jasmine proceeded with procurement and construction of the paint booth. Id. at ¶¶ 30, 31. On May 14, 2006, Jasmine delivered the paint booth to Kuwait and notified Captain Tulloch that it was ready for delivery upon approval of additional funds or written approval of acceptance. Id. at ¶ 34. The Army allegedly did not provide any acceptance or payment. Id.

On or around November 13, 2006, Jasmine submitted a claim seeking 61,912.72 Kuwaiti Dinars for all of the equipment and supplies. Fifth Am. Compl. ¶ 42; Fourth Am. Compl., Ex. L. On September 29, 2009, Jasmine received the COFD denying its claim in its entirety. Fifth Am. Compl. ¶ 43.[4]

**Jasmine's Contract to Supply Water: The 0050 Contract**

In September 2004, Major Cockerham assisted in awarding Jasmine a contract to provide water in Iraq and Kuwait, Contract No. W912D1-04-A-0050 ("0050 Contract"). Am. Answer ¶ 116. Between October 2004 and May 2005, Major Cockerham issued five calls under the 0050 Contract for deliveries of bottled water. Id. at ¶ 117. From 2004 to 2005, the Army paid Jasmine $3,031,093.06 for these calls under the 0050 Contract issued by Major Cockerham. Id. at ¶ 118. On September 28, 2004, the Army also awarded a contract to provide bottled water, Contract No. W912D1-04-A-0053, to D & J Trading, the company jointly incorporated by Major Cockerham and Mr. Salem. Id. at ¶¶ 107, 116.

On December 19, 2004, Jasmine's trucks delivered water supplies to the TAJI Army Base in Iraq pursuant to the 0050 Contract. Fifth Am. Compl. ¶ 59. When the trucks were offloaded, uniformed Army personnel directed the truck drivers to load military equipment into the trucks and transport the equipment to Camp Doha and Camp Arifjan in Kuwait.[5] Id. When the trucks arrived in Kuwait, Major Cockerham and Major Derrick Shoemaker told the truck drivers that the Army could not receive delivery of the equipment until it received authorization and confirmation from the TAJI Army Base. Id. at ¶ 60. Major Cockerham instructed Jasmine personnel to store the equipment until the Army received authorization, and Major Timothy Petty assured Jasmine personnel that the Army would promptly pay the transport and storage cost. Id.

---

[4] Defendant did not assert any counterclaims with respect to the 1172 Contract.

[5] Camp Arifjan is approximately 600 miles from the TAJI Army Base. Fifth Am. Compl. ¶ 59.

at ¶¶ 60, 61. Major Petty instructed Jasmine personnel to deliver the equipment to a designated delivery point when he received authorization and confirmation, and Jasmine delivered the equipment on January 14, 2005, after storing it for 29 days.[6] Id. at ¶¶ 62, 65. On January 28, 2006, Jasmine sent an invoice to Major Petty, charging $695,400 for backhauling, delivery, and storage fees. Id. at ¶ 66.

Jasmine performed a similar backhauling mission under the 0050 Contract that same month, January 2005. On January 17, 2005, Jasmine transported two "green containers" from Iraq to Camp Arifjan in Kuwait. Id. at ¶ 67. On January 28, 2006, Jasmine sent an invoice to Major Petty, charging $36,600 for backhauling, delivery, and storage fees. Id. at ¶ 69. The Army allegedly did not pay either invoice. Id. at ¶ 70. On or around January 25, 2008, Jasmine submitted a claim seeking 201,475 Kuwaiti Dinars, which included backhauling, storage, and delivery of military equipment. Id. at ¶ 76; Fourth Am. Compl., Ex. T. On or around September 28, 2009, Jasmine received the contracting officer's interim decision denying Jasmine's claims for unpaid services related to backhauling. Fifth Am. Compl. ¶ 77.

**Procedural History**

Plaintiff filed this action on March 3, 2010. Plaintiff subsequently amended its complaint several times and filed its fifth amended complaint on March 16, 2012. Plaintiff invokes the Contract Disputes Act ("CDA") and claims that Defendant breached the 0931 Contract, the 0007 Contract, the 1172 Contract, and the 0050 Contract. Id. at ¶¶ 15, 37, 53, 71. On August 14, 2012, Defendant filed a motion for leave to file an amended answer to Plaintiff's fifth amended complaint. The Court granted Defendant's motion on August 15, 2012, and accepted its amended answer for filing as of that date. Order entered 08/15/2012, Doc. 62. In its amended answer, Defendant asserted counterclaims under the FFCA, the FCA, and common-law fraud.

On October 19, 2012, Plaintiff filed a motion to dismiss Defendant's amended counterclaims, arguing that the Court lacked subject-matter jurisdiction over Defendant's counterclaims and that Defendant failed to state a claim upon which relief may be granted. Pl.'s Mot. to Dismiss Def.'s Am. Countercls. ("Pl.'s Mot.") 1. On July 23, 2013, this Court held a hearing on Plaintiff's motion to dismiss and advised the parties that it would defer ruling on the motion pending a decision from the United States Court of Appeals for the Federal Circuit in Kellogg Brown and Root Services, Inc. v. United States, No. 2012-5106. Tr. 166. Consequently, this action was stayed from July 24, 2013 to March 28, 2014. On October 20, 2014, Defendant voluntarily dismissed its counterclaims asserted under the FFCA and the FCA, in light of the Federal Circuit's ruling in Kellogg Brown and Root Services, Inc. v. United States, 728 F.3d 1348 (Fed. Cir. 2013) ("KBR III"). Def.'s Suppl. Opp'n to Pl.'s Mot. to Dismiss Def.'s Countercl. 1. Defendant continues to press its common-law fraud counterclaim, and Plaintiff seeks dismissal of this counterclaim in the motion sub judice.

---

[6] Jasmine used 19 trucks to deliver two hummers, two 20-foot containers, one helicopter, one truck, and one truck full of miscellaneous equipment. Id. ¶ 64.

## Discussion

### Standard of Review

Plaintiff moves to dismiss Defendant's counterclaim for failure to state a claim upon which relief can be granted under Rule 12(b)(6). Pursuant to Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); see Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (construing Rule 8 of the Federal Rules of Civil Procedure, which is identical to RCFC 8). To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Iqbal, 556 U.S. at 678 (2009). As the Federal Circuit recently recognized in ABB Turbo Systems AG v. Turbousa, Inc.:

> [t]o avoid dismissal under Rule 12(b)(6), the complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Rule 8's pleading standard "does not require 'detailed factual allegations.'" Iqbal, 556 U.S. at 678 . . . . But it requires more than "barren recitals of the statutory elements, shorn of factual specificity," Speaker v. Dep't of Health & Human Servs., 623 F.3d 1371, 1384 (11th Cir. 2010), and more than the mere possibility of liability or mere consistency with liability, Iqbal, 556 U.S. at 678; Twombly 550 U.S. at 557, 570. What is needed is "facial plausibility" of the claim, which exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). Rule 8 "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the alleged violation. Twombly, 550 U.S. 556.

774 F.3d 979, 984-85 (2014). To determine whether a complaint states a plausible claim for relief, a court must engage in a context-specific analysis and "draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

### Rescission and Disgorgement

Defendant raises a counterclaim for common-law fraud, contending that Jasmine's contracts are void or voidable and that the Government is entitled to rescission and disgorgement of all sums paid to Jasmine under the 0931 Contract, the 0007 Contract, and the 0050 Contract because the contracts "were tainted by bribery, conflict of interest, and fraud." Am. Answer ¶ 144.

7

Plaintiff argues the Court must dismiss Defendant's counterclaim for common-law fraud because Defendant "failed to properly allege a causal link between the claimed fraudulent activity and Jasmine's acquisition of the three contracts at issue." Pl.'s Mot. 25. The elements of common-law fraud are:

> (1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived, which induces him to act thereon, and (5) injury to the party deceived resulting from reliance on the misrepresentation.

Unigene Lab., Inc. v. Apotex, Inc., 655 F.3d 1352, 1359 (Fed. Cir. 2011) (citing In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 807 (Fed. Cir. 2000)). "[A] Government contract tainted by fraud or wrongdoing is void ab initio." Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993) (citing J.E.T.S., Inc. v. United States, 838 F.2d 1196, 1200 (Fed. Cir. 1988)). It is well established that a contract may be adjudged void ab initio where there exists the type of severe legal infirmity that would preclude the parties' exchange of promises from giving rise to an enforceable agreement. See Total Medical Mgmt., Inc. v. United States, 104 F.3d 1314, 1321 (Fed. Cir. 1997); Godley, 5 F.3d at 1476; United States v. Amdahl Corp., 786 F.2d 387, 394-95 (Fed. Cir. 1986).

In KBR III, the Federal Circuit held that but-for causation is required to establish a common-law fraud claim. 728 F.3d at 1371. The Federal Circuit stated:

> [t]his court's precedent confirms that common-law fraud is not established simply by showing that kickbacks were paid to personnel involved in contract decision-making: 'Illegal acts by a government contracting agent do not alone taint a contract . . . Rather the record must show some causal link between the illegality and the contract provisions.' . . . [F]raud must be a but-for cause of the outcome to satisfy the requirements of common-law fraud.

Id. (quoting Godley, 5 F.3d at 1476). In KBR III, the Federal Circuit affirmed the dismissal of the common-law fraud claim because, notwithstanding the kickbacks, the contract at issue would have been awarded to the same subcontractor. Id. at 1372. Under KBR III, to assert a cognizable common-law fraud claim, Defendant must allege that fraud was the but-for cause of the awards of the three contracts Defendant seeks to void. See id.

Defendant's common-law fraud claim meets this causation standard. The following allegations in Defendant's amended answer and counterclaim directly link Jasmine's alleged fraudulent activities to the contract awards:

- "Diaa Salem [Jasmine's CEO] agreed with Mr. Cockerham to give things of value to Mr. Cockerham, including providing money directly to Mr.

8

Cockerham's sister, Carolyn Blake, in exchange for the award of contracts, BPAs, and calls issued thereunder, to companies which Diaa Salem owned, controlled, and/or had an interest in, including Jasmine and D & J Trading." Am. Answer ¶ 103.  "In spring of 2004 . . . , Mr. Salem gave Mr. Cockerham $1,200 in cash."  Id. at ¶ 106.  "On or about August 27, 2004 . . . , Mr. Salem paid for Ms. Blake's week-long stay at the Crowne Plaza Hotel in Kuwait.  Mr. Salem gave her several hundred Kuwaiti dinars in spending money." Id. at ¶ 109.  "On July 5, 5005, Diaa Salem sent a wire transfer in the amount of $60,000 to Ms. Blake." Id. at 111.

- "In or around August 2004, Mr. Salem offered to pay Mr. Cockerham $1 million in exchange for the award of Government contracts." Id. at ¶ 110.

- "During September 2004, Mr. Cockerham assisted in awarding calls for two bottled water BPAs to Mr. Salem's companies, including . . . BPA W912D1-04-A-0050 (BPA 0050) awarded to Jasmine on September 28, 2004 . . . . Mr. Cockerham issued five calls under BPA 0050 . . . for deliveries of bottled water . . . . The Army paid Jasmine $3,031,093.06 for the calls under BPA 0050 issued by Mr. Cockerham alone." Id. at ¶¶ 116-18.

- "In September 2004, Mr. Cockerham also assisted in awarding another contract to Jasmine, Contract W912D1-04-P-0931 (Contract 0931)." Id. at ¶ 120.

- "On or about September 25, 2004, Mr. Cockerham signed a memorandum recommending that Jasmine be awarded Contract 0931 for the lease and servicing of latrines. Jasmine ultimately was awarded Contract 0931 on September 28, 2004." Id. at ¶¶ 121-22.

- "Jasmine's price for the services was higher than at least three other contractors who submitted proposals in response to solicitation W912D1-06-R-0011. Jasmine's proposal for services exceeded the next lowest proposal by more than 17 percent . . . . Mr. Cockerham assigned ratings to the bids that gave Jasmine the highest adjectival rating.  Upon information and belief, Mr. Cockerham added points inconsistently among all proposals to favor Jasmine's proposal. On or around November 7, 2005, the Army awarded Jasmine Contract 0007," under solicitation number W912-D1-06-R-0011. Id. at ¶¶ 127, 129-30.

- "From at least April 2004 until July 2005, Mr. Salem promised Mr. Cockerham money and other things of value in exchange for the award of contracts, BPAs and calls thereunder to Jasmine, including BPA 0050, Contract 0931, and Contract 0007." Id. at ¶ 136.

Defendant alleges a direct causal nexus between Plaintiff's bribery scheme and Major Cockerham's recommendation of Jasmine for the 0931 Contract, his favoring Jasmine's offer in the ratings for the 0007 Contract, his assistance in awarding Jasmine the 0050 Contract, and his issuance of five calls under the 0050 Contract.  Defendant has pled sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that Major Cockerham's fraudulent

conduct was a but-for cause of Jasmine's receipt of these awards. Twombly, 550 U.S. at 556. At the pleading stage, the salient inquiry is not whether Defendant is likely to prevail on the merits, but instead whether it is entitled to offer evidence in support of its counterclaim. Chapman Law Firm Co. v. Greenleaf Constr. Co., Inc., 490 F.3d 934, 938 (Fed. Cir. 2007).

With respect to the 0050 Contract, Plaintiff acknowledges that Defendant pled that Major Cockerham assisted in awarding calls and issued five calls to Jasmine under this contract. Pl.'s Suppl. Reply 8. In order to distance Major Cockerham from these awards and render but-for causation implausible, Plaintiff asserts that these calls "could reasonably have been expected to be issued to Jasmine anyway, given that Jasmine had been awarded the umbrella 0050 contract." Id. In so arguing, Plaintiff invites this Court to ignore the procedure for deciding a Rule 12(b)(6) motion and to assume facts directly contradicting Defendant's allegation—not to assess, as Twombly and Iqbal direct, whether Defendant's allegations of causation are plausible.

Plaintiff asks the Court to dismiss the allegations that Major Cockerham had a conflict of interest, assisted in awarding the calls, and actually issued five calls under this contract as implausible based on its say-so that there was some amorphous, unattributed "reasonable expectation" that these calls would have been awarded to Plaintiff "anyway." Pl.'s Suppl. Reply 8. This Court recognizes that "courts deciding a motion to dismiss for insufficient pleading may consider the strength of alternative explanations of the alleged facts." ABB Turbo Sys. AG, 774 F.3d at 987. However, Plaintiff's unsupported suggestion that Jasmine would have been awarded these calls "anyway," goes well beyond offering an alternative explanation of the alleged facts—it seeks to substitute a wholly different factual basis for these awards without evidence.

In KBR III, the Federal Circuit affirmed the trial court's finding following a trial that KBR would have awarded the subcontract at issue notwithstanding the kickbacks paid to personnel involved in contract decision-making. The Court in KBR III emphasized the factual record supporting the trial court's conclusion:

> [T]he Court of Federal Claims also found that ample evidence supports a finding that Tamimi would have received the award of the work at Anaconda regardless of Mr. Hall's actions, crediting the testimony of Mr. Jonas, KBR's former Vice President for Procurement Materials and Property, who testified that the award of WR 3 to Tamimi just made sense and that it would have been irresponsible on the part of KBR at that time to attempt to use another subcontractor at Anaconda. Additionally, the Court of Federal Claims found that [t]he notion of awarding the work at all four DFACs at Anaconda did not originate with Mr. Hall, but with Mr. [Jim] Spore, then-Regional Project Manager for Northern Iraq. Unlike Godley, this case is not before us on summary judgment, and the Court of Federal Claims did determine, as a finding of fact, that the illegal conduct overall did not irreparably taint the contract, i.e., that Tamimi would have received a Master Agreement and WR 3 absent any participation by Messrs. Hall and Holmes.

10

KBR III, 728 F.3d at 1372 (alteration in original) (internal quotations omitted).  Plaintiff's effort to undermine allegations in Defendant's counterclaim without the benefit of evidence does not alter the fact that here at the pleading stage, Defendant did allege the requisite link between a decision-maker with a conflict of interest and the award of these calls.  See ABB Turbo Sys. AG, 774 F.3d at 987.  It would be error for this Court to conclude that these allegations are implausible and subject to dismissal simply because Plaintiff has failed to elaborate on the extent of Major Cockerham's input into the award decisions at the pleading stage.  See ABB Turbo Sys. AG, 774 F.3d at 986-87 (reversing the district court's dismissal for insufficient pleading because "[t]he court's analysis was too demanding of specificity and too intrusive in making factual assessments").

Plaintiff sets up a similar construct in asking this Court to dismiss the counterclaim implicating the 0931 Contract.  There, Plaintiff acknowledges that Defendant pled both that Major Cockerham assisted in the September 28, 2004 award and signed an award-recommendation memorandum three days earlier as a point of contact.  Pl.'s Suppl. Reply 9.  Plaintiff points out that three other individuals were named in the memorandum as recommending the award and submits that, because Major Cockerham was not one of these three recommenders and was not the contracting officer on that contract, the allegations did not sufficiently link Major Cockerham with the award decision.  Plaintiff suggests that Major Cockerham did not exercise a sufficient degree of assistance in this award process to establish his status as a decision-maker.  Such a demand for specificity is unwarranted at this pleading stage.  As the Federal Circuit instructed in ABB Turbo Sys. AG, "[t]he [trial] court's analysis was too demanding of specificity and too intrusive in making factual assessments.  ABB has alleged 'enough facts to state a claim to relief that is plausible on its face;' it has 'nudged [its] claims across the line from conceivable to plausible.'"  744 F.3d at 986 (quoting Twombly, 550 U.S. at 570) (alteration in original).

Given Defendant's allegations that Major Cockerham assisted in the award, was a contracting officer, signed the recommendation memorandum as a point of contact, and provided the review folder, Defendant has alleged enough facts to "nudge" its common-law fraud claim "across the line from conceivable to plausible."  The allegations that Major Cockerham orally directed Jasmine to increase the quantity of latrines and services and that Jasmine complied with this request further indicates that the scope of the 0931 Contract may have been increased as a direct result of Major Cockerham's authorization—adding to the plausibility of an inference that Major Cockerham had decision-making responsibility for this contract.  So too, the allegation that it was Major Cockerham who accepted Plaintiff's quote to provide additional services for another 113 latrines, further suggests that he exercised decision-making responsibility for the Army's acquisition of services covered by the 0931 Contract.  Whether Major Cockerham's fraudulent conduct and personal involvement in the award process tipped the scales in favor of an award to Jasmine is an intensely factual inquiry not to be resolved at the pleading stage based upon titles in a memorandum.

Finally, Plaintiff contends that Defendant failed to allege causation with respect to the award of the 0007 Contract.  Plaintiff acknowledges that Defendant pled that Major Cockerham wrote the solicitation with price being the most important factor, rated proposals, gave Jasmine

the highest adjectival rating, and, upon information and belief, "added points inconsistently among all proposals to favor Jasmine." Def.'s Am. Countercl. ¶ 129. Plaintiff seeks dismissal of this common-law fraud counterclaim, arguing that Defendant failed to allege that Major Cockerham was a decision-maker with respect to the 0007 Contract because he was not the source selection official or the contracting officer on that contract. Despite the fact that Major Cockerham did not bear these titles, he was a contracting officer on other contracts, and it is plausible that Major Cockerham's alleged conduct in drafting the solicitation and manipulating Jasmine's scoring in the evaluation resulted in the selection of Jasmine's proposal.

With respect to all of these awards, Plaintiff views the involvement of government contracting personnel in the source selection and award process too narrowly. While the source selection official is the final decision-maker, his award decision may well be informed by the views of his subordinates, especially evaluators and contracting officials. Award decisions are subjective, and, at this juncture, it would be premature for the Court to conclude that it is implausible that Major Cockerham exercised sufficient decision-making authority to either direct these awards to Jasmine or orchestrate scenarios ensuring that awards to Jasmine would be the outcome.

Defendant expressly alleges that the contracts were awarded in exchange for bribes and payments Jasmine made or agreed to make to a Government contracting official and his sister. This suffices to meet the pleading requirement for but-for causation set forth in KBR III. Whether or not the alleged fraud was, in fact, the but-for cause of the awards to Plaintiff is a matter to be determined following trial.

## Conclusion

Plaintiff's motion to dismiss is **DENIED**. The Court will convene a telephone status call on **April 21, 2015**, at **11:00 a.m. EST** to schedule further proceedings.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**